IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT GLENN LAVARIER,           )
                                 )
                    Plaintiff,   )      No.  09 CV 7881
                                 )
            v.                   )      Magistrate Judge Michael T. Mason
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
                    Defendant.   )

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Robert Lavarier ("Lavarier" or "claimant"), has filed a motion for

summary judgment seeking judicial review of the final decision of the Commissioner of

Social Security ("Commissioner") denying Lavarier's disability claim under the Social

Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423(d).  The Commissioner filed a cross-

motion for summary judgment asking this Court to affirm the decision of the

Administrative Law Judge.  We have jurisdiction to hear this action pursuant to 42

U.S.C. § 405(g).  For the reasons set forth below, Lavarier's motion for summary

judgment [20] is granted in part, the Commissioner's cross-motion for summary

judgment [24] is denied, and the case is remanded for further proceedings consistent

with this opinion.

I.      BACKGROUND

        A.      Procedural History

Lavarier filed his application for disability benefits on September 6, 2006, alleging

that he became disabled March 3, 2005 due to disorders of his back. (R. 82.) The Social Security Administration ("Administration") denied his application on December 6, 2006. (R. 84-88.) Claimant filed a motion for reconsideration on December 19, 2006. (R. 94.) The Administration affirmed its denial of benefits on January 30, 2007. (R. 96-99.) Lavarier requested a hearing before an Administrative Law Judge ("ALJ") on March 22, 2007. (R. 101.) The hearing occurred on May 7, 2008, before ALJ John S. Pope. (R. 27-81, 107.) On September 15, 2008, ALJ Pope issued his ruling denying Lavarier disability benefits. (R. 13-24.) Lavarier requested a review of the ALJ's decision. (R. 12.) On November 4, 2009, the Appeals Council affirmed ALJ Pope's decision, making his decision the final decision of the Commissioner. (R. 1-3); *Hopgood v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Lavarier subsequently filed this action in federal district court.

**B.    Medical History**

A variety of physicians treated the claimant, both before and after his application for disability benefits. Their records, as well as claimant's completed questionnaires and various medical examiners' records from the application process, establish the claimant's medical history. They are summarized below.

**1.    Dr. Cesario M. Cumba, Treating Physician**

Dr. Cesario M. Cumba, M.D., a doctor at the Tratt Clinic, was the first doctor reflected in the record to treat Lavarier. (R. 439-55.) He first saw claimant in February 1986, and stopped seeing the claimant in 1996, although they did meet briefly in July 2005. (R. 455, 441.) While Dr. Cumba's notes are generally illegible to this Court, and the ALJ's opinion does not discuss them, they do offer a few pieces of information. Dr.

Cumba's notes from February 18, 1986, mention Lavarier's anxiety, apparently as a diagnosis.  (R. 455.)  The notes also show that Dr. Cumba prescribed the claimant medication, including Tranxene, beginning in 1986.  (R. 454-55.)  They also mention that at a June 8, 1991 appointment, Lavarier reported feeling a tightening in his chest. (R. 449.)

### 2.    Dr. Ronald Wuest, Treating Psychiatrist

In 1997, Dr. Cumba referred Lavarier to Dr. Ronald Wuest, a psychiatrist at the Institute for Personal Development, so Dr. Wuest could treat Lavarier's chest pains and anxiety.  (R. 488.)  Claimant continued to see Dr. Wuest until 2002, when Dr. Wuest apparently refused to continue to treat the claimant because of the claimant's persistent "noncompliance," apparently including numerous missed appointments.  (R. 467, 469.) While Dr. Wuest took notes in this period, they are largely illegible.  (R. 469-88.) Further, the ALJ's decision does not mention them.  While it is possible to decipher the words "OCD" and "somatization" in multiple places in Dr. Wuest's notes, it is unclear whether those appearances reflect a diagnosis.  (R. 484, 485.)

### 3.    Dr. John Goldin-Mertdogan, Treating Psychiatrist

After Dr. Wuest dropped Lavarier from his patient list, the claimant began treatment with Dr. John Goldin-Mertdogan, M.D., another psychiatrist at the Institute for Personal Development.  Their first appointment was December 30, 2002, and they continued to meet until July 15, 2005.  (R. 464-67.)  While Dr. Goldin-Mertdogan's notes are difficult to read, they are not completely indecipherable, and this Court was able to glean the following from them.

Dr. Goldin-Mertdogan's notes dated December 30, 2002, state that claimant

3

reported he had not had a panic attack in the previous four years. (R. 467.) Lavarier also reported feeling very depressed over his father's death, and that his father's death caused Lavarier, a recovered alcoholic and prior smoker, to resume smoking. (*Id.*) On February 3, 2003, Dr. Goldin-Mertdogan noted that the claimant reported he felt even more depressed over his father's death, so Dr. Goldin-Mertdogan increased the claimant's dosages of Anafranil and Tranxene, and started the claimant on Remeron. (R. 466.) Dr. Goldin-Mertdogan also wrote that Lavarier stated he felt anxious and overwhelmed by his financial problems and a felony charge. (*Id.*) While Dr. Goldin-Mertdogan noted improvement on March 31, 2003, he later reported on July 7, 2003 that Lavarier was having more panic attacks, and was very depressed, as the anniversary of his father's death approached. (R. 465.) On December 15, 2003, Lavarier reported his belief that his depression, as well as problems with "overwhelming anxiety," prevented him from functioning at work. (R. 464.) On July 15, 2004, Dr. Goldin-Mertdogan noted that Lavarier was frustrated about being demoted at work. (*Id.*) He also observed that claimant was increasingly anxious and was having panic attacks, which were perhaps related to the anniversary of his father's death. (*Id.*) That was the last meeting between Dr. Goldin-Mertdogan and Lavarier documented in the record.

### 4. Dr. James K. Smedegard, Treating Psychiatrist

Dr. James K. Smedegard, M.D., a psychiatrist, began to treat Lavarier when Lavarier came to the Grundy County Health Department. (R. 227-28, 309-18, 435-37, 497.) At their initial meeting on September 8, 2005, Dr. Smedegard evaluated the claimant. (R. 228.) Dr. Smedegard wrote that Lavarier was alert oriented, soft spoken, and goal-directed without delusions or hallucinations. (R. 229.) Dr. Smedegard found

that the claimant's insight and judgment were fair, and his attention and concentration were intact.  (*Id.*)  He noted that the claimant's global assessment of functioning ("GAF") score ranged from 45-50, a score which the ALJ stated indicates serious symptoms, including suicidal ideation, and serious impairment in social and occupational functioning.  (R. 229, 22.)  Claimant reported not taking his prescriptions when he was feeling well or when he could not afford them.  (R. 228.)  Dr. Smedegard continued Lavarier with Tranxene, and resumed Remeron.  (R. 229.)

After their initial meeting, Dr. Smedegard continued to have regularly scheduled appointments with Lavarier.  Unfortunately, several of his notes are illegible to the Court, namely those after the initial evaluation and before August 2007, as well as the notes from a June 26, 2008 meeting.  (R. 309-316, 497.)  Still, some notes are typewritten and legible, and provide information regarding the claimant's condition. After their meeting on August, 3, 2007, Dr. Smedegard diagnosed Lavarier with major depression and benzodiazepine dependence (Tranxene is a benzodiazepine).  (R. 435.) He recommended more individual therapy and increased claimant's prescription of Celexa.  (*Id.*)  On October 18, 2007, Dr. Smedegard noted that Lavarier reported his mood was stable on Celexa, and that his remaining frustration and depression were due to his circumstances.  (R. 436.)  After their December 17, 2007 meeting, Dr. Smedegard continued to believe that Lavarier suffered from major recurrent depression, as well as benzodiazapene dependence.  (R. 437.)  He continued to recommend the current treatment regime, with a gradual reduction of his level of Tranxene.  (*Id.*)

Supplementing these notes are Dr. Smedegard's diagnoses on the Multnomah Community Ability Scale ("MCAS").  (R. 423-34.)  On August 31, 2006, Lavarier scored

a 68 on the MCAS.  (R. 430.)[1]  Scores between 63-85 represent a high level of ability.  (*Id.*)  On December 17, 2007, Lavarier scored a 57 on the MCAS, with the biggest changes being in the categories of socialization (interests/involvement in activities) and adjustments to living.  (R. 423.)  Any score in the range of 48-62 indicates a medium level of ability.  (*Id.*)

### 5.    Ms. Susan C. Hudson, Treating Therapist

When Lavarier started services with Grundy County Health Department and Dr. Smedegard, he also began to regularly meet with Susan C. Hudson, MA LCPC, QMHP, LPHA, a mental health therapist.  (R. 227, 233, 235, 237-248, 250, 252-54, 319-21, 324, 326, 328-39, 341, 343-45, 407-15, 417-22, 457-60, 494-96, 498.)  Ms. Hudson's session notes provide detailed information about Lavarier.  Their first session was on July 25, 2005.  (R. 254.)  Her notes from their early sessions indicate that Lavarier mentioned experiencing pain and clutched his chest, something he attributed to his anxiety instead of a physical cause.  (R. 243, 245, 253.) She also noted that Lavarier indicated a decreasing ability to function in his interpersonal relationships, but that he was able to maintain a sense of appropriateness.  (R. 240, 246.)  In these initial meetings, Ms. Hudson attributed and linked Lavarier's problems to unresolved grief over his father's death.  (R. 230, 240, 244, 319.)

Ms. Hudson also noted minor swings, as well as an overall general decline, in Lavarier's condition over the course of their sessions. In early 2006, she observed that the claimant was improving.  (R. 242.)  While Lavarier reported severe depression in

---

[1]  While this page lists multiple dates, the Court understands it to track changes over time, and to present claimant's final score as of August 31, 2006.

April, Ms. Hudson still noted improvement in Lavarier's condition in mid-2006. (R. 237, 239, 240.) However, by August and September of 2006, she noted a general worsening in Lavarier's condition, which she believed to be caused by his unresolved grief over his father's death. (R. 230, 233, 407.) In January, 2007, she wrote that Lavarier started to discuss his concern that he had an undiagnosed stroke. (R. 319.)

In April 2007, Ms. Hudson noted that Lavarier's depression had been worsening, and that he had told her that he was in too much pain to get up. (R. 418.) Her notes indicate that he told her that, due to financial restraints, he had stopped taking his medication. (*Id.*) On September 11, 2007, after seeing the claimant for the first time after two months of missed appointments, Ms. Hudson reported that Lavarier appeared to be continuing in a downward spiral from depression, anxiety, and frustration. (R. 411.) At this time, Lavarier began to claim in his sessions with Ms. Hudson that his anxiety caused him to be fired from his previous job. (*Id.*) Ms. Hudson reported in October 2007 that claimant still continued to believe he suffered from an undiagnosed medical condition. (R. 409.)

In January 2008, Ms. Hudson stated her belief that grief over claimant's father's death had dragged him into a deep depression – a theory she continued to express in her notes in June 2008. (R. 408, 495-96.) She also indicated, in January of 2008, that the claimant would not be able to successfully treat his symptoms with medication. (R. 408.) Additionally, for the first time, she expressed her belief that Lavarier would be unable to secure employment because of his mental afflictions. (*Id.*) She reiterated that opinion in her notes from subsequent sessions, such as on March 18, 2008. (R. 459.) At one of their last sessions before the hearing before the ALJ, in April 2008, Lavarier

discussed his panic attacks in significant detail.  (R. 457.)

### 6.    Nurse Julie Nevins, Treating Nurse

While attending Grundy County Health Department, Lavarier met with Nurse

Julie Nevins, a Registered Nurse and Qualified Mental Health Professional, in addition

to Dr. Smedegard and Ms. Hudson. (R. 231-32, 234, 236, 249, 251, 322-23, 325, 327,

340, 342, 416.)  While most of the notes are barely legible, it is possible to glean some

facts from Nurse Nevins' reports of their meetings.  In general, Lavarier's meetings with

Nurse Nevins were fairly short, each lasting approximately ten minutes.  Their meetings

largely consisted of Nurse Nevins implementing Dr. Smedegard's treatment plan,

monitoring whether Lavarier was stable on his medications, and helping him file his

initial application for disability benefits.  (*Id.*)

On September 8, 2005, Nurse Nevins wrote that she met with Lavarier to monitor

his status on medications, and to implement Dr. Smedegard's treatment plan.  (R. 342.)

She noted that Lavarier reported to her that he felt the medications were helpful. (R.

342.)  She made similar points on October 3, 2005, and stated that she was referring

claimant to a physician for a medical checkup.  (R. 340.)  However, the record does not

indicate whether such an appointment ever occurred.  After their meetings on June 1,

and August 24, 2006, Nurse Nevins reported that Lavarier stated he was taking his

medications as prescribed and felt they were effective.  (R. 327, 325.)

In her notes from their meetings on August 31 and September 6, 2006, Nurse

Nevins reported that she began to assist claimant with filing his application for disability

benefits.  (R. 322-23.)  That was their last recorded meeting, aside from a single report

dated May 31, 2007, where claimant reported to Nurse Nevins that he was taking his

medications, felt stable on the treatment plan, and denied any side effects.  (R. 416.)

### 7.    Claimant's Activities of Daily Living Questionnaires

On October 18, 2006, claimant completed questionnaires titled "Activities of Daily Living Questionnaire" and "Activities of Daily Living Questionnaire for Physical Impairments."  (R. 189-96.)  In his "Activity of Daily Living Questionnaire," claimant described that he rented a small house and cooked twenty percent of his meals.  (R. 189.)  When asked about household maintenance and the chores he could perform, he detailed that he did the dishes and picked up the house to keep it clean.  (*Id.*)  He also wrote that he had a lot of pain, requiring him to frequently rest, and that his condition was worsening.  (*Id.*)  When asked whether his condition affected his "bathing, hair care or dressing," he responded yes because he had difficulty standing.  (R. 190.)  In the category of general information, he wrote that these problems began between the age of 30 and 33, he had trouble finishing things he started because of the pain he experienced, he was forgetful, and he heard voices and saw people who were not around.  (*Id.*)  In particular, he wrote that he saw and heard the voice of his dead father. (*Id.*)  When discussing his activities and interests, he wrote that he left his home two to four times a week, to visit family, keep appointments, and walk the dog.  (R. 191.) When he left the house, he would usually walk or drive.  (*Id.*)  He also claimed he had trouble sleeping because of the pain.  (*Id.*)  When asked about his ability to get along with others, he wrote that he did not enjoy socializing with other people because he would often be angry and fight with people.  (*Id.*)  In listing his activities, he wrote that he would sometimes drive and watch television.  (*Id.*)  He also noted that his pain "keep's me from finishing anything [sic]."  (R. 190.)

9

In his "Activities of Daily Living Questionnaire for Physical Impairments," Lavarier wrote that he felt pain, weakness, and fatigue for many activities involving his arms and hands, such as using kitchen tools, opening twist lids, turning pages or sorting and filing papers, dialing the phone, picking up a coin, using a writing utensil, dressing, maintaining personal hygiene, and carrying bags.  (R. 194.)  He also wrote under "standing and moving about" that he felt pain continuously in his left side, fatigue, and weakness.  (*Id.*)  Thus, he had to move slowly when getting in and out of a car, up from a sofa or out of bed, and when using a shower or bathtub.  (R. 195.)  Claimant also reported that he avoided stairs when possible, and could only manage ten steps "slowly" at a time.  (*Id.*)  He stated he needed assistance standing and walking, and had to use the support of another person, furniture and counters, and a cane.  (*Id.*)  He also wrote "I would use a cane but have no medical help."  (*Id.*)  Claimant indicated he could sometimes sit for at least two hours, and could not shop or cook for more than 20 minutes without needing to sit.  (*Id.*)  Claimant stated that during the day he needed numerous rest periods because of the pain.  (*Id.*)  When asked whether he could perform chores, he wrote "I do what I can just to keep feeling like a person."  (*Id.*)  He reported he did not do any yard work or house repairs, play sports, or use exercise equipment.  (R. 196.)

### 8.    Dr. William N. Hilger, Examining Pyschologist

Dr. William N. Hilger, Ph.D., a clinical psychologist at the Ostir Clinic, conducted psychological testing on the claimant for the Bureau of Disability Determination Services on October 31, 2006.  (R. 259-63.)  Prior to his evaluation, Dr. Hilger reviewed an "Adult Disability Report completed by the claimant," but no "formal medical reports" were

provided for his review.[2] (R. 259.) Dr. Hilger conducted an hour long interview with the claimant. (*Id.*) Dr. Hilger reported that Lavarier drove himself to the appointment, was casually dressed, poorly groomed, unshaven, and had a strong odor of cigarettes. (*Id.*) When he observed Lavarier's motions, he saw that Lavarier had a normal gait and posture, and showed no sign of invalidism or pain in walking, rising, sitting, or standing. (*Id.*) Lavarier also appeared to have full use of his left arm and hand. (*Id.*) Dr. Hilger observed a small cyst on Lavarier's lower right neck. (*Id.*) He noted claimant was overly talkative, dramatic, and rambling. (*Id.*) Additionally, Dr. Hilger wrote that Lavarier would talk to his father "when he gets frustrated." (R. 260.) It is unclear whether that statement stems from Dr. Hilger's first-hand observation of Lavarier during their meeting, or whether Dr. Hilger reported what he had read on Lavarier's Activities of Daily Living Questionnaire, wherein Lavarier reported that he saw and heard the voice of his dead father. (R. 190.)

After testing Lavarier's mental capacity, Dr. Hilger made several conclusions. (R. 262-63.) First, he concluded that Lavarier had fair mental potential and could perform any work-related activities involving memory and understanding, sustained concentration and persistence, social interaction, and adaptation. (R. 263.) However, Dr. Hilger stated that Lavarier may be limited to lighter, less physically demanding work. (*Id.*) He also wrote that Lavarier's anxiety disorder appeared fairly well-controlled with medication. (R. 262.) Finally, Dr. Hilger observed that Lavarier's anxiety attacks

---

[2] The record does not contain any document entitled "Adult Disability Report." It appears Dr. Hilger may have reviewed one (or both) of the Activities of Daily Living Questionnaires Lavarier had completed earlier in the month.

appeared to begin when Lavarier tried to quit drinking, but he did not indicate a causal relationship between those facts.  (R. 261.)

### 9. Dr. Afiz Taiwo, Examining Physician

As part of the disability application process, Dr. Afiz Taiwo, M.D. and M.P.H., a physician at Gozi Health Services, conducted a physical examination of Lavarier on November 18, 2006.  (R. 278-81.)  Over the course of 30 minutes, Dr. Taiwo reviewed "forms" and interviewed and examined Lavarier.  (R. 278.)  He reported speaking with Lavarier about his history of depression and anxiety.  (*Id.*)  They also discussed Lavarier's evidently "worsening" numbness and loss of sensation in his left extremities, and the constant tingling and numbness Lavarier reported feeling in his left arm and leg.  (*Id.*)

During a discussion of Lavarier's daily activities, Lavarier stated he was able to walk 50 feet, stand for 20 minutes, and sit for 30-60 minutes before noticing pain in his left leg.  (R. 279.)  He testified being capable of lifting, pulling, and pushing 10 pounds with his left hand, and 30-40 pounds with his right hand.  (*Id.*)  Lavarier said he could feed himself, but could not cook since he did not trust himself with fire.  (*Id.*)  Similarly, he reported being unable to clean, having trouble bathing and dressing, and not driving or shopping.  (*Id.*)

After conducting a physical examination, Dr. Taiwo offered several observations. He noticed a large cyst on Lavarier's neck.  (R. 279.)  He also observed left arm and leg weakness, a weakness that was particularly noticeable in the left hand grip.  (R. 280.) In the course of the physical examination, Lavarier could get on and off the exam table, and walk more than 50 feet unassisted.  (R. 280.)  He also had a normal range of

motion in his shoulders, elbows, and wrists.  (R. 280.)  However, he did have difficulty

with heel-toe walking.  (R. 280.)  Lavarier also did well in the mental status examination.

(R. 280.)  Dr. Taiwo's final impression was that Lavarier suffered from cervical

radiculopathy and left extremity weakness.  (R. 281.)

### 10.    Dr. Joseph Mehr, Examiner

On November 9, 2006, Dr. Joseph Mehr, Ph.D., submitted a form entitled

"Psychiatric Review Technique" regarding Lavarier's claim.  (R. 282-95.)  In completing

the form, he based his answers on the treatment notes submitted by Grundy County

Health Department and Dr. Hilger's report.  (R. 294.)  Dr. Mehr concluded that Lavarier

suffered from a non-severe impairment, namely, an anxiety-related disorder under

Listing 12.06.  (R. 282.)  While Dr. Mehr observed the disorder did not exactly satisfy

the diagnostic criteria under Listing 12.06, he did acknowledge the claimant had an

anxiety disorder.  (R. 287.)  However, he also concluded that this disorder was fairly

well-controlled on medication.  (*Id.*)  Dr. Mehr did not check the box indicating the

existence of a somatoform disorder under Listing 12.07.  (R. 282.)  When reviewing the

"B" criteria of the Listings of disorders, Dr. Mehr concluded that there were only mild

restrictions on Lavarier's daily living activities, his ability to maintain social functioning,

and his ability to maintain concentration, persistence, and pace.  (R. 292.)  Dr. Mehr did

not note any episodes of decompensation.  (*Id.*)

### 11.    Dr. Delano Zimmerman, Examiner

On November 30, 2006, Dr. Delano Zimmerman, M.D., performed a physical

residual functional capacity ("RFC") assessment of claimant.  (R. 296-303.)  It appears

that he based his analysis on Dr. Taiwo's examination.  (*Compare* R. 296, 303 *with* R.

13

280.)  Dr. Zimmerman diagnosed Lavarier with cervical radiculopathy.  (R. 296.)  When discussing exertional limitations in his RFC assessment, Dr. Zimmerman stated that Lavarier could occasionally lift up to 50 pounds, and frequently lift up to 25 pounds.  (R. 297.)  He believed that Lavarier could stand and walk for 6 hours in an 8 day workday.  (*Id.*)  Dr. Zimmerman concluded that Lavarier could sit for 6 hours in an 8 day workday, and that the claimant could push and pull.  (*Id.*)  Dr. Zimmerman's report, when reviewing postural limitations, stated that Lavarier could occasionally climb a ramp and stairs, but never a ladder, rope, or scaffold.  (R. 298.)  His report states that Lavarier could frequently balance, stoop, kneel, crouch, and crawl.  (*Id.*)  Dr. Zimmerman also noted that Lavarier did not suffer from any manipulative, visual, or communicative limitations.  (R. 299-300.)  Finally, according to Dr. Zimmerman's RFC report, Lavarier must avoid concentrated exposure to hazards, such as machinery and heights.  (R. 300.)

### 12.    Dr. Calixto Aquino, Examiner

On January 25, 2007, Dr. Calixto Aquino, M.D., reconsidered and affirmed Dr. Zimmerman's RFC assessment.  (R. 360-62.)  He appeared to rely on Dr. Taiwo's physical examination as well as Dr. Hilger's examination, and never met with claimant.  (R. 362.)  He also indicated that Lavarier was not completely honest earlier with Dr. Taiwo.  (R. 362.)  Based on these sources, he suggested that Lavarier relapsed into alcoholism after his father's death, despite Lavarier's statements that he had not drunk alcohol in years.  (*Id.*)  Dr. Aquino also wrote that while claimant reported not driving, Dr. Hilger's report reflects that claimant did drive to Dr. Hilger's examination on October 31, 2006.  (*Id.*)  Dr. Aquino also noted claimant's prior statement to Ms. Hudson that he

14

believed that his physical symptoms resulted from abruptly stopping all medication. (*Id.*) After expressing these thoughts, Dr. Aquino affirmed Dr. Zimmerman's physical RFC and said there was no sign of physical ailments. (*Id.*)

### 13. Dr. Jerrold Heinrich, Examiner

On January 29, 2007, Dr. Jerrold Heinrich, Ph.D., submitted a second form entitled "Psychiatric Review Technique" regarding Lavarier's claim. (R. 346-58.) Unlike Dr. Mehr's review, it is unclear what sources of information Dr. Heinrich relied upon, but the dates set forth in Dr. Heinrich's report indicate their source was Grundy County Health Department. (R. 358.) Dr. Heinrich diagnosed Lavarier with an affective disorder under Listing 12.04, and with an anxiety-related disorder under Listing 12.06. (R. 346.) When reviewing the affective disorders under Listing 12.04, Dr. Heinrich found that Lavarier had a depressive disorder with the symptoms of sleep disturbance and difficulty concentrating or thinking. (R. 349.) Since the Listing required a finding of more symptoms of the disorder, Dr. Heinrich concluded that Lavarier had a medically determinable "depressive disorder" that did not precisely satisfy Listing 12.04's criteria. (*Id.*)

When discussing the anxiety-related disorders under Listing 12.06, he again concluded that Lavarier had a medically determinable "depressive disorder" that did not precisely satisfy that Listing's criteria. (R. 351.) When he examined both of the disorders under the "B" criteria of the Listings, he said that there was a mild restriction on Lavarier's daily living activities. (R. 356.) He also concluded that there were moderate restrictions on claimant's ability to maintain social functioning and maintain concentration, persistence, and pace. (R. 356.) Dr. Heinrich noted no episodes of

decompensation.  (R. 356.)  He also found that neither disability met the requirements of a "C" criterion.  (R. 357.)  Like Dr. Mehr, Dr. Heinrich did not check the box indicating the existence of a somatoform disorder under Listing 12.07.  (R. 346.)  Dr. Heinrich also noted that as of January 11, 2007, the claimant had ceased medication "due to lack of finances."  (R. 358.)

Dr. Heinrich also completed a mental RFC analysis regarding Lavarier on January 29, 2007.  (R. 363-66.)  In performing this analysis, Dr. Heinrich reached a number of conclusions as to Lavarier's mental capacity.  First, Dr. Heinrich stated that there was either no evidence of a limitation or no significant limitation of Lavarier's understanding and memory.  (R. 363.)  As for Lavarier's concentration and persistence, Dr. Heinrich concluded there was no evidence of any limitation of Lavarier's ability to carry out short and simple instructions, or to make simple work-related decisions.  (*Id.*)  Dr. Heinrich reported there were no significant limitations on Lavarier's ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, or work in coordination or proximity to others without being distracted by them.  (*Id.*)  According to Dr. Heinrich, there was only a moderate limitation on Lavarier's ability to maintain attention and concentration for extended periods.  (*Id.*)  Finally, Dr. Heinrich found no significant limitation on Lavarier's ability to complete a normal workday and work-week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 364.)

With respect to Lavarier's ability to engage in social interaction, Dr. Heinrich

concluded that while there was a moderate limitation on Lavarier's ability to interact appropriately with the general public, there was no significant limitation on his ability to ask simple questions or seek assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers without distracting them or exhibiting behavioral extremes, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (R. 364.)  Finally, when looking at the claimant's adaptive skills, Dr. Heinrich found a moderate limitation on Lavarier's ability to respond appropriately to changes in the work setting, no evidence of limitation in his ability to be aware of normal hazards and take appropriate precautions or travel in unfamiliar places or use public transportation, and a non-significant limitation on his ability to set realistic goals or make plans independently of others.  (*Id.*)  Dr. Heinrich's ultimate conclusion was that Lavarier retained the mental and behavioral capacity to do at least simple tasks within the limitations noted.  (R. 365.)

### C. Testimony

Lavarier and William Schwise, the vocational expert, testified at the May 7, 2008 hearing before the ALJ.  (R. 35-80.)  Their testimony was supplemented by a letter written by LouAnn Lavarier, the claimant's wife, and submitted for the ALJ's consideration.  (R. 135-36.)

### 1. Testimony of Claimant

The claimant testified that he was 50 years old at the time of the hearing, that he had been educated through the ninth grade but never received a GED, and that he had not received vocational training of any kind.  (R. 35-36.)  At the time of the hearing, Lavarier stated he was unemployed, and that he had been unable to hold a job for more

than a few weeks since his fifteen-year employment at Smurfit Stone as a sheeter operator was terminated in March 2005.  (R. 36-38.)

The ALJ first questioned Lavarier about his physical ailments. Lavarier testified that he was unable to lift more than 10-20 pounds.  (R. 40, 56.)  He claimed to feel a tingling and numbness in his left side.  (R. 40.)  Additionally, he stated he felt "extreme" "tingling" pain in his left side about 90 percent of the time, running from his shoulder down to his ankle.  (R. 54-55.)  Lavarier testified that physical activity exacerbated this pain, and lying down would reduce it.  (R. 55.)  Lavarier apparently clutched the left side of his chest at the hearing.  (R. 67-68.)  Lavarier also stated he had trouble standing and walking.  (R. 41.)  When the ALJ inquired about this, claimant reported he could walk for less than an hour total in an eight hour period, and stand for a total of a half hour in that same period.  (R. 56.)  Lavarier also stated that he had to sit for half an hour of every hour, for a total of four hours in the same eight hour period.  (R. 56-59.)

When the ALJ asked about his daily routine, Lavarier said he could only do small chores around the house, such as washing dishes, and could watch television.  (R. 45-48.)  Lavarier testified that he was capable of dressing himself, but could only shower five times a week because of his physical ailments.  (R. 47-48.)  He exercised by walking around the block, "when it's possible."  (R. 48.)  While he believed he is physically capable of driving, he does not drive out of fear of anxiety attacks.  (R. 59.)

The ALJ also inquired if the claimant was aware of the condition of cervical radiculopathy, but Lavarier was not aware of the condition and apparently had never discussed it specifically with a medical professional.  (R. 40.)  More generally, Lavarier reported that he had not seen a doctor for physical pain since he was terminated from

18

his employment in 2005, at the latest.  (R. 42.)  The last time he recalled seeing a doctor for a physical ailment was in 2003 for a swelling problem in his legs.  (*Id.*)  According to Lavarier's testimony, the doctor he saw put no restriction on his physical activities.  (*Id.*)

After discussing Lavarier's physical ailments, the ALJ inquired about his mental issues.  Lavarier testified about his "extreme problems" with anxiety and his depression.  (R. 48.)  When the ALJ asked Lavarier about his anxiety, Lavarier said that he often had anxiety attacks.  (R. 49.)  He gave the frequency, but it is unclear from the transcript if these attacks happened several times a day, several days of the week (2-3 attacks per day, 2-3 days of the week), or if they occurred several times a week.  The transcript of the exchange between the ALJ and claimant is as follows:

> Q.    Okay.  Do you have panic attacks with your anxiety?
> A.    Extreme.
> Q.    How often do you get them?
> A.    Some days I'll have two, three times a day.
> Q.    What's - -
> A.    Mildly.  And then other ones - -
> Q.    Is that pretty typical, two or three times a day?
> A.    At least two, three times a week.

(R. 49.)  Lavarier also testified that his anxiety attacks could last anywhere between half an hour to an entire night.  (*Id.*)  When describing those attacks, Lavarier stated that they often caused shortness of breath and a sharp pain across his upper chest, and forced him to lie down for the duration of the attack.  (*Id.*)  He also testified that the attacks prevented him from attending work, and could have resulted in danger to others if he had one while operating machinery at his past job.  (R. 60-62, 66.)  He was quite emphatic that he would not be able to return to work because he would be fired for an

inability to complete tasks and attend work because of these attacks.  (R. 68-69.)  When the ALJ inquired about his depression, Lavarier indicated that he often felt depressed and wanted to "give up" because of his fear concerning the anxiety attacks and being rejected at work.  (R. 50, 65-66.)  Lavarier testified his depression would cause crying fits, each generally lasting half an hour, two or three times a week.  (R. 65.)

Lavarier also testified to other mental issues.  First, he said that he had trouble concentrating at times, including at the hearing.  (R. 53-54.)  Second, he gave contradictory testimony regarding his ability to get along with other people.  Early in the hearing, he stated that he had no problem getting along with people outside of the house.  (R. 53.)  Later in the hearing, he said he often felt angry and frustrated with others, which led him to shun the company of coworkers.  (R. 63-64, 68, 70.)

When the ALJ asked about treatment, Lavarier said he has been going to Grundy County Health Department for treatment every four to six weeks over the past two years.  (R. 50.)  He stated he met with his therapist, Ms. Hudson, for one hour every four to six weeks.  (R. 50-51.)  He also testified he saw Dr. Smedager for five to ten minutes every three months.  (*Id.*)  While Lavarier could not recollect precisely which medications he was taking at the time of the hearing, he did report that he felt better since he had started therapy and medication at Grundy.  (R. 43, 52, 65-66.)

### 2.      Letter of LouAnn Lavarier

Lavarier's wife, LouAnn Lavarier, submitted a handwritten letter to ALJ Pope for consideration along with the claimant's hearing testimony.  (R. 135-36.)  She wrote that she had observed a drastic change in the claimant over the previous four years.  (R. 135.)  She stated that his anxiety attacks were increasingly frequent, causing him to

often miss work and eventually lose his job.  (*Id.*)  She wrote that Lavarier's left side "is constantly going numb," and that he will clutch his side where he feels pain.  (*Id.*)  She commented that the claimant had a difficult time concentrating on more than one thing at a time, and that he had trouble lifting objects weighing more than ten pounds.  (*Id.*)  She observed that her husband was unable to drive or operate machinery on his medication.  (R. 136.)  She asserted her conclusion that Lavarier "no longer is capable" of working, mentally or physically.  (*Id.*)

### 3.    Testimony of William Schwise

William Schwise, a vocational expert ("VE Schwise"), appeared at the hearing before ALJ Pope, and testified about various vocations he opined the claimant could pursue.  (R. 70-80.)  VE Schwise testified that Lavarier's relevant past work experience consisted of unskilled, and semiskilled, heavy and very heavy physical labor.  (R. 74-76.)  The ALJ then asked a series of hypothetical questions. He also asked VE Schwise if there would be employment opportunities available to the claimant given different findings of disability.  (R. 76-80.)

First, the ALJ asked what would be the employment opportunities available to a hypothetical hypsometrical individual, between 47-50 years of age, who was educated at a ninth grade level, possessed the claimant's relevant past work experience, was limited to medium work, who could never climb ladders or scaffolds, could occasionally climb ramps and stairs, could frequently balance, stoop, kneel, crouch, and crawl, must avoid concentrated exposure to hazards, and was limited to simple repetitive tasks with the public, coworkers, and supervisors.  (R. 76-77.)  VE Schwise responded that this person could not perform his relevant past work because he must avoid concentrated

exposure to hazards.  (R. 77.)  However, VE Schwise stated such an individual would be capable of performing unskilled entry-level jobs, such as laborer and janitorial positions, since both of those positions were within the medium range of physical exertion.  (*Id.*)

The ALJ asked what level of labor this same hypothetical individual could perform if he was limited to light labor, or if he was limited to sedentary work.  (R. 78-79.)  VE Schwise said that there were about 30,000 jobs in the region that this individual could perform if he was restricted to light labor, and 15,000-20,000 jobs if the individual was limited to sedentary work.  (R. 78-79.)  Lastly, the ALJ asked if there would be any jobs available to the claimant if he found Lavarier's claims totally credible and supported by medical evidence.  (R. 79.)  VE Schwise replied that there would be no jobs since the claimant would be unable to work for a full day and could not be around others.  (R. 79-80.)  This would preclude employment since the tolerance for absences of unskilled laborers was no more than one to one and a half days a month.  (R. 80.)

## II.     LEGAL STANDARD

### A.     Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 396, 940 (7th Cir. 2002).  This is a deferential standard of review.  *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Substantial evidence is more than a scintilla of proof.  *Kepple v. Massanari*, 268 F.3d 513, 515-16 (7th Cir. 2001).  It means evidence a reasonable person would "accept as adequate to support the decision."  *Murphy v. Astrue*, 496. F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater,* 55 F.3d 300, 305

(7th Cir. 1995) (*quoting Richardson v. Perales,* 402 U.S. 389, 401 (1971)). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 515-16. However, we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm that decision. *Clifford*, 227 F.3d at 869. While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to his conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision," *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). In other words, "the issue before this court is whether the ALJ's findings were supported by substantial evidence, not whether [claimant] is disabled." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

### B.     Analysis under the Social Security Act

For a claimant to receive disability benefits, that claimant must be disabled under

the Social Security Act ("Act").  The Act defines a person as disabled if that person is "unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be of such severity that he "is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The regulations establish a five-step sequential inquiry to evaluate a disability claim.  *See* 20 C.F.R. § 404.1520(a)(4).  The ALJ must consider the following five questions, in order: (1) Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments that are conclusively disabling, or, if not what is the claimant's residual functional capacity ("RFC")?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy? *See* 20 C.F.R. § 404.1520(a)(4); *Zalewski v. Heckler,* 760 F.2d 160, 162 n.2 (7th Cir. 1985); *Clifford*, 227 F.3d at 868.

The claimant has the burden of establishing disability at steps one through four. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  If the claimant reaches step five, the burden shifts to the Commissioner to show that the claimant is capable of working in the national economy.  *Zurawski*, 245 F.3d at 886; *Clifford*, 227 F.3d at 868 (7th Cir. 2000).  Under the five-part sequential evaluation process, "[a]n affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the

24

claimant is disabled.  A negative answer at any point, other than step 3, stops [the] inquiry and leads to a determination that the claimant is not disabled." *Zalewski,* 760 F.2d at 162 n.2 (*citing* 20 C.F.R. § 404.1520).

ALJ Pope followed this five-step inquiry.  At step one, the ALJ found that Lavarier was not engaged in any substantial gainful activity since March 3, 2005, the alleged onset date.  (R. 18.)  At step two, the ALJ found Lavarier had the following severe impairments: degenerative disc disease with cervical radiculopathy, depression, and anxiety.  (*Id.*)  At step three, the ALJ determined that while Lavarier was severely impaired, he was not conclusively disabled because he did not have an impairment, or combination of impairments, that met or medically equaled one listed in 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1.  (R.19-20.)  He then determined Lavarier's RFC.  (R. 20-22.)  At step four, the ALJ determined that Lavarier was unable to return to his past relevant work experience.  (R. 22-23.)  At step five, the ALJ, relying on VE Schwise's testimony, determined that a person with Lavarier's RFC could perform work in the national economy.  (R. 23-24.)

## III.    ANALYSIS

Lavarier asserts that ALJ Pope's decision was erroneous for four reasons. He argues (1) that the ALJ erred in not finding him disabled at step three; (2) the ALJ's mental RFC finding was incorrect; (3) the ALJ erred in not considering Lavarier under the Grids (a series of tables turned into separate rules that the ALJ uses at step five of the inquiry to determine whether the claimant's RFC would allow him to engage in work in the national economy); and (4) the ALJ erred in not considering whether Lavarier had somatoform disorder.  We address each argument below.

25

Before delving into those arguments, we address the Commissioner's argument that Lavarier waived any challenge to the ALJ's evaluation of Lavarier's physical impairments. That waiver argument is largely misplaced here. In this case, Lavarier's physical abilities and mental ailments are inextricably linked. While Lavarier may not have challenged the finding of what he physically could do if he had no mental limitations, his argument is that his mental impairments undermine his ability to achieve his physical potential. Lavarier claims that his mental impairments preclude him from realizing even the modest physical abilities that the ALJ deemed him to have. As the Vocational Expert noted, if the ALJ were to find the claimant credible regarding his mental impairments, the claimant would be unable to find work because his condition would result in excessive absences. (R. 80.) As a result, we decline to conclude that the claimant waived any challenge to the ALJ's evaluation of claimant's physical ailments.

### A. The ALJ Did Not Sufficiently Articulate his Assessment of the Evidence at Step Three.

Lavarier claims that the ALJ did not properly consider the true effect of his anxiety and his somatoform disorder at step three. ALJ Pope, when considering whether Lavarier was disabled, stated that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment in 20 CFR Part 404, Subpart P, Appendix 1." (R. 19.) Lavarier maintains that the ALJ did not appropriately consider his anxiety and somatoform disorders. Notably, he does not suggest that the finding regarding his depression was inaccurate. Given the unique circumstances surrounding Lavarier's argument related to his alleged somatoform

disorder, that argument is considered separately below. As a result, we focus our inquiry on whether the ALJ should have found Lavarier presumptively disabled at step 3 based on the record evidence of his anxiety.

At step three, the ALJ must establish whether the claimant's impairment meets or equals a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Ch. III, Pt, 404, Subpt. P, App. 1. A conclusion that the claimant's impairment meets or equals an impairment in Appendix 1 leads the ALJ to the conclusion that the claimant is presumptively disabled. *See* 20 C.F.R. § 404.1520(d). The relevant Listing in Lavarier's case is Listing 12.06, which pertains to anxiety related disorders. *See* 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, Listing 12.06. To have an anxiety related disorder equal to that in Listing 12.06, a claimant has to show that he meets the requirements of either (1) categories A and B in Listing 12.06, or (2) categories A and C in Listing 12.06. *See id.*

The ALJ concluded that Lavarier's anxiety did not meet the requirements of either category B or C, and that Lavarier's anxiety did not equal the anxiety disorder described in Appendix 1, Listing 12.06 – meaning that Lavarier was not conclusively disabled under step three's analysis. (R. 19-20.) Because of the framework of Listing 12.06, there was no need to examine the requirements of category A, since the ALJ merely needed to show, with substantial evidence, that neither Part B nor Part C of Listing 12.06 was met.[3]

_____

[3] Claimant maintains that the ALJ never consulted a medical expert regarding whether his condition equaled a Listing, as he was required to do. (Pl's Mem. at 7 [22].) Claimant's assertion is factually incorrect. The ALJ reviewed the reports of Dr. Mehr and Dr. Heinrich, each of whom is a medical expert. (R. 282-95, 346-58.) The ALJ must receive into the record

27

1.    **The ALJ's Decision Did Not Sufficiently Explain or Justify His Conclusion that Claimant Did Not Meet Category B of Listing 12.06.**

To meet category B of Listing 12.06, a claimant must show two of the following problems: (1) a marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, Listing 12.06. The ALJ concluded that the record did not support a finding that the claimant had shown two of these problems. (R. 19-20.) First, he found only a mild restriction on daily living activities based on Lavarier's hearing testimony of those activities he performed. (R. 19.) Second, when the ALJ looked at claimant's ability to maintain social functioning, the ALJ said that he had only moderate difficulties, not marked difficulties. (R. 19.) The ALJ based that conclusion on Dr. Hilger's observations during his evaluation, wherein Dr. Hilger indicated that the claimant could respond appropriately when spoken to and initiate conversation. (R. 19.)

Third, the ALJ found only moderate difficulties with regard to Lavarier's concentration, persistence, and pace, and concluded that "the claimant is able to concentrate and attend to task sufficient enough for unskilled work [sic]." (R. 19.) He stated that this conclusion was supported by "objective medical evidence," without citation to anything specific. (R. 19.) He also stated his conclusion was "[b]ased on

---

the opinion of a medical expert, but he does not need to have an expert testify at the hearing. *See Barnett v. Barnhart*, 381 F.3d 664, 670-71 (7th Cir. 2004). The ALJ satisfied that obligation.

review of the same [unspecified] criteria" as well as claimant's testimony, but did not cite any evidence in particular. (R. 19-20.) He noted that "[t]reatment records are replete with the claimant's preoccupation with obtaining disability benefits." (R. 19.) Finally, the ALJ found that the claimant had experienced no episodes of decompensation. (R. 20.) On that basis, the ALJ concluded that Lavarier's impairments did not meet the requirements of category B of Listing 12.06.

There is other evidence in the record that supports the ALJ's conclusion, such as the fact that neither Dr. Mehr nor Dr. Heinrich found the existence of "B" criteria, as well as Dr. Hilger's report regarding claimant's concentration, persistence, and pace. (R. 263, 292, 356.) However, the ALJ did not do a sufficient job of "build[ing] an accurate and logical bridge from the evidence to his conclusion." *Dixon*, 270 F.3d at 1176. There needs to be more analysis and articulation as to how the ALJ arrived at his conclusions from specific evidence in the record.

Additionally, Lavarier offers eleven pieces of evidence that he claims support his contention that he meets Listing 12.06. (*See* Pl's Mem. at 7-11.) While some of those pieces of evidence may be relevant primarily to claimant's mental RFC, it is troubling that the ALJ did not discuss any of those pieces of evidence when determining whether Lavarier meets Listing 12.06. On remand, the ALJ should address claimant's arguments, especially since several of the pieces of evidence clearly implicate factors in category B of Listing 12.06. For example, the ALJ should address the extent to which Lavarier's alleged rage, and the evidence regarding his lack of emotional temperament to frequently interact with others, implicate his ability to maintain social functioning. (*Id.* at 8, 10.) Similarly, to the extent that his appearance indicates an inability to engage in

daily living activities, the ALJ should discuss it.  (*Id.* at 9.)  The fifth and eighth pieces of evidence that Lavarier offers come from diagnostic testing conducted by Grundy County Health Department. They indicate that Lavarier may have problems in several of category B's factors – particularly his GAF and MCAS scores.  (*Id.* at 8-9, 10.)  In short, the ALJ should specifically discuss all the important evidence relevant to Listing 12.06 in describing and justifying his conclusion.

On the whole, the record contains some evidence indicating that Lavarier may meet Listing 12.06, and other evidence indicating that he does not.  We emphasize that we are not determining whether Lavarier is actually disabled under step three of the five-step inquiry.  Instead, we are determining whether substantial evidence in the record supports the ALJ's conclusion. *Jens*, 347 F.3d at 212.  While the ALJ need not discuss every piece of evidence, he must sufficiently articulate his assessment to assure us that he considered the important evidence and enable us to trace the path of his reasoning.  *Dixon*, 270 F.3d at 1176.  That burden was not met here because the ALJ failed to explicitly articulate his findings and cite sufficient supporting evidence, and because he failed to confront the evidence contrary to his conclusion and explain why he rejected that evidence.  *Indoranto*, 374 F.3d at 474.  As a result, the issue of whether Lavarier meets the factors in Listing 12.06's category B is remanded for further consideration.

**2.      The ALJ Did Not Sufficiently Explain or Justify His Conclusion that Claimant's Impairments Did Not Meet or Equal Category C of Listing 12.06.**

A claimant meets the requirement in category C of Listing 12.06 if he shows a complete inability to function independently outside the area of his home.  *See* 20

C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, Listing 12.06. After setting forth this inquiry, ALJ Pope stated only that after "a thorough review of the record, the [ALJ] finds that the record fails to suggest any basis for a conclusion that the requirements of Part C are met in this case." (R. 20.)

While Lavarier does not argue this point, we again find that the ALJ here failed to "build an accurate and logical bridge from the evidence to his conclusion." *Dixon*, 270 F.3d at 1176. His lack of discussion on this issue in light of the general evidence supporting Lavarier's claim of disability is troubling. That is not to say there is no evidence supporting the ALJ's finding. Among other things, Dr. Heinrich specifically checked a box saying that there was no evidence Lavarier met a "C" criteria for his anxiety. (R. 357.) Simply put, on remand, the ALJ should be more specific, reference the evidentiary support for his finding, and describe his rejection of any contradictory evidence.

### B.    The ALJ's Finding Regarding Lavarier's Mental RFC is Deficient.

Lavarier next argues that the ALJ erred in making his finding regarding Lavarier's RFC. Under the five-step inquiry in determining disability, after the ALJ determines that a claimant's impairment does not equal a Listing in Appendix 1, which means he or she is not presumptively entitled to disability, the ALJ must determine the claimant's RFC, and then decide if someone with that capacity could find work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4). ALJ Pope concluded that Lavarier had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he could not climb ladders, ropes, or scaffolds, could only occasionally climb ramps and stairs, could frequently balance, stoop, kneel, crouch, and crawl, and must avoid concentrated

exposures to hazards. (R. 20.) As for Lavarier's mental RFC, the ALJ stated that Lavarier was limited to simple, repetitive tasks involving only occasional contact with the public, co-workers, and supervisors. (*Id.*)

As noted above, while Lavarier does not explicitly challenge the ALJ's findings regarding his physical RFC, he does challenge the ALJ's findings regarding his mental RFC, and argues that his mental impairments prevent him from being able to use his modest physical abilities. (Pl's Mem. at 11-12.) Claimant argues that the ALJ erred in his conclusions regarding claimant's mental RFC because the ALJ ignored evidence favorable to him. More specifically, Lavarier argues that his mental impairments prevent him from regularly attending work, staying on task and concentrating, and performing at a consistent pace. As the vocational expert acknowledged, if the ALJ were to find the claimant completely credible, then Lavarier would be unemployable because of his mental condition, as his anxiety would preclude steady work attendance. (R. 79-80.) The ALJ did not find Lavarier to be completely credible regarding his allegations of mental limitations. (R. 21.) The ALJ also gave credence to Dr. Smedegard's and Dr. Hilger's beliefs that Lavarier's anxiety could be controlled through medication. (R. 22.) Based on the evidence that Lavarier's anxiety was treatable, the ALJ concluded that Lavarier would be able to regularly attend work. (*Id.*)

While some evidence does support the ALJ's conclusion regarding Lavarier's mental RFC, we remand the issue for further consideration because the ALJ did not adequately address issues related to credibility and did not account for the alleged deterioration in Lavarier's condition. With respect to credibility, we note that because the ALJ is in a far superior position to assess the credibility of a witness, we will only

32

reverse if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, the ALJ must abide by the requirements of Social Security Ruling ("SSR") 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Under SSR 96-7p, "the ALJ's assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings." SSR 96-7p. Here, the ALJ's opinion did not sufficiently discuss Lavarier's testimony about his condition, or address the notes of Ms. Hudson, Lavarier's therapist, and the diagnosis of Dr. Smedegard, both of which support Lavarier's claims regarding the effect those symptoms have on his ability to function. While that evidence is largely based on claimant's self-reported symptoms and thus undoubtedly implicates issues of credibility, the ALJ must make those assessments explicit in his ruling, particularly because they involve evidence that contradicts his conclusion. SSR 96-7p; *Indoranto*, 374 F.3d at 474.

As for the deterioration in Lavarier's condition during the disability application process, Ms. Hudson's notes indicate a significant worsening in Lavarier's condition beginning in late 2006 and continuing through 2007 and 2008. (R. 230, 233, 408, 411, 418.) The ALJ's failure to discuss that evidence is problematic, since much of the evidence he relies upon, such as Dr. Hilger's report, dates from late 2006 and early 2007 – the beginning of this change. (R. 259, 363.) If Ms. Hudson's notes are credible, then the reports of the expert examiners may not remain convincing descriptions of the treatability of Lavarier's condition. The ALJ's evaluation on remand should specifically

33

address this aspect of Ms. Hudson's notes and evaluate the findings and conclusions by Dr. Higler and the other examiners accordingly.

Because we are remanding the matter to the ALJ, we also direct the ALJ to consider the following four additional issues relevant to claimant's RFC. First, the ALJ should consider whether Lavarier had ceased taking his medication beginning in January 2007, and if so, the ALJ should consider the consequences of that failure, including whether that may have contributed to the deterioration that Ms. Hudson documented. (R. 358, 418.) We note that the record is somewhat unclear as to the timing of claimant's failure to take his medication. Lavarier evidently reported to Dr. Heinrich that he had ceased medication for financial reasons as of January 11, 2007 (R. 358), but reported to Nurse Nevins in May 2007 that he was taking his medication. (R. 416.) After resolving that timing issue, the ALJ should consider what impact any such failure may have had on Lavarier's condition, and how that impact affects his RFC. While such a failure may warrant the denial of benefits, under certain circumstances a failure to take medication is not always grounds for denial of disability benefits. *See Buchholtz v. Barnhart*, 98 Fed. Appx. 540, 545-46 (7th Cir. 2004) (observing that a claimant's failure to follow treatment may be justified in some circumstances, such as when the treatment was ineffective or the claimant was unable to afford it).

Second, the ALJ should consider that Dr. Smedegard, by the end of 2007, was concerned that Lavarier suffered from benzodiazepine dependence, and attempted to change Lavarier's treatment regimen. (R. 437.) Thus, the ALJ should consider how treatable Lavarier's condition really is, given the possibility that the treatment plan he apparently believed could control Lavarier's condition may no longer be viable. Third,

the ALJ assumed from Lavarier's testimony that he suffered from 2-3 anxiety attacks a week, each of which lasted up to an hour. (R. 21.) However, Lavarier's testimony also supports the conclusion that Lavarier would occasionally suffer 2-3 anxiety attacks *per day*, 2-3 times *per week*, and that each attack could last hours. (R. 49). On remand, the ALJ should take further hearing testimony from Lavarier to clarify that issue, and consider that testimony in connection with claimant's RFC. Finally, Lavarier claimed in his Activities of Daily Living Questionnaire that he saw and heard the voice of his dead father. (R. 190.) Dr. Hilger also reports this fact in his psychological evaluation. (R. 260.) The ALJ should consider that evidence on remand as well.

### C. The ALJ Failed to Properly Account for Lavarier's Age in Applying the Grids.

Lavarier argues that the ALJ erred in not applying the Medical-Vocational Guidelines ("the Grids"). (Pl's Mem. at 12-13.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. Claimant contends that the ALJ should have used Table No. 1, Rule 201.09, which applies to claimants limited to sedentary work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1 § 201.09.

The Grids are a series of tables turned into separate rules that "classify a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience." *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005) (citation omitted). The Grids are used at step five, wherein the ALJ determines whether the claimant's RFC would allow him to engage in work in the national economy. The Commissioner can carry his burden at step five by "showing that the claimant's RFC, age, education, and work experience coincide exactly with a rule in the ... [Grids]."

*Harris v. Astrue*, No. 09 C 50082, 2010 WL 5186772, at *9 (N.D. Ill. Dec. 10, 2010).

When all the criteria of a particular rule are met, "the [Grids] will direct a finding of

disabled or not disabled." *Haynes*, 416 F.3d at 628. "But when a claimant does not

perfectly match the criteria set forth in the grids, the grids are not mandated." *Id. (citing*

SSR 83-10, 1983 WL 31251, at *1).

The ALJ used Table No. 2, Rule 202.18, which applies to claimants limited to

light labor who are of a younger age (ages 18-49). (R. 23.) *See* 20 C.F.R. Pt. 404,

Subpt. P, App. 2, Table 2, § 202.18. However, the ALJ failed to consider that Lavarier

was 50 years old at the time of the hearing. (R. 35.) That means under the Grids, he

was not a younger individual, but an individual closely approaching advanced age (ages

50-54). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(d). As a result, the ALJ

should have used the Grid for individuals closely approaching advanced age, as

indicated by Lavarier's age at the time of the hearing. *See Tom v. Heckler*, 779 F.2d

1250, 1254, 1257 (7th Cir. 1985) (noting, in the context of applying the Grids, that

claimant was 63 at time of hearing). Since the Table used by the ALJ is for younger

individuals, it should not have been applied in Lavarier's case.

On remand, the ALJ should properly account for Lavarier's age when

determining the applicable Grid. Additionally, the ALJ should apply the appropriate Grid

in light of the reexamination of Lavarier's RFC we have ordered him to undertake.

**D.      On Remand, the ALJ should Consider Evidence that Lavarier Suffers
            from a Somatoform Disorder.**

Lavarier argues the ALJ erred by failing to consider whether he suffered from a

somatoform disorder. (Pl's Mem. at 7.) "The term 'somatoform disorder' refers to what

used to be called 'psychosomatic' illness: one has physical symptoms, but there is no physical cause." *Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006). According to the Social Security Administration regulations, somatoform disorder is characterized by "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07. Claimant argues that the ALJ should have considered this disorder at step three, and determined whether his somatoform disorder satisfied Listing 12.07. *See* 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, Listing 12.07. (*See* Pl's Mem. at 7.) As discussed above, a finding that the claimant's impairment meets or equals a listing in Appendix 1 merits a finding that the claimant is presumptively disabled. *Barnett*, 381 F.3d at 668; 20 C.F.R. § 404.1520(d). A finding that the claimant suffers from a somatoform disorder would also influence the ALJ's analysis at other steps in the disability inquiry.

Lavarier correctly asserts that the ALJ never considered a potential claim of a somatoform disorder. However, the possibility that Lavarier may suffer from such a disorder was not raised in the record by any of the doctors who treated Lavarier since 1986, other than isolated uses of the word "somatization" in Dr. Wuest's notes. (R. 484, 485.) Nor was the issue of the disorder raised at the hearing by Lavarier's own attorney. Neither of the two doctors who performed a psychiatric review of Lavarier's file, Dr. Heinrich and Dr. Mehr, checked the box on their form indicating the presence of a somatoform disorder. (R. 288, 352.) Nor did Dr. Hilger conclude from his psychological testing that Lavarier suffered from a somatoform disorder. (R. 259-63.)

The problem, as Lavarier notes, is that neither Dr. Mehr nor Dr. Heinrich had access to Lavarier's complete medical history at the time of their evaluations. (Reply at

2; *see also* R. 294, 358) (indicating that both doctors relied only on Grundy County Health Department's records). Thus, neither doctor saw Dr. Wuest's notes, which included the word "somatization," although based on their illegibility, it is unclear whether that was a diagnosis. (R. 484, 485.) This reasoning does not apply to Dr. Hilger, who did not review past medical history and independently made his own evaluation. (R. 259.)

The ALJ can hardly be faulted for failing to examine an issue that was not raised by the claimant, or by all but one of Lavarier's own physicians, or by the doctors who interviewed Lavarier during the disability process. However, the situation remains troubling, since Dr. Wuest's notes do support the possibility that Lavarier suffers from a somatoform disorder. The question is what should this Court do?

The situation is analogous to *Vujnovich v. Astrue*, No. 2:10-CV-43, 2011 WL 1157499 (N.D. Ind. Mar. 28, 2011). There, the claimant alleged disability on the basis of osteoarthritis in her neck, knees, and hips, numbness in her arm and head, heart palpitations, rapid pulse, difficulty breathing, and dizziness, but did not claim obesity as an impairment. *Id.* at *1. Further, her obesity was mentioned in a single medical note as a diagnosis in a 400+ page record. *Id.* at *8. That claimant also failed to explain how her weight condition exacerbated her claimed impairment through testimony or other evidence in the record. *Id.* Ultimately, that court held that the obesity issue did not require it to remand the case, but since it was remanding the case for an independent reason, it held that it could require the ALJ to consider the obesity issue on remand. *Id.* at **8-9; *see also Clifford*, 227 F.3d at 873 (remanding because of the ALJ's failure to consider obesity at step three of the five-step inquiry).

38

As in *Vujnovich*, we need not decide whether the somatoform issue constitutes independent grounds for remand.  However, because this matter is being remanded to the ALJ for further consideration of various other issues, we direct the ALJ to also consider on remand the issue of whether Lavarier suffers from a somatoform disorder. We respectfully direct the ALJ to obtain additional evidence, expert and otherwise, whether in the form of additional hearing testimony or reports, to resolve the somatoform disorder issue.  *See, e.g., Clifford*, 227 F.3d at 873 ("If the ALJ believes that he lacks sufficient evidence to make a decision, he must adequately develop the record and, if necessary, obtain expert opinions."); *see also Spaulding v. Halter*, 11 Fed. Appx. 596, 602-03 (7th Cir. 2001) (directing on remand that the ALJ consult an additional medical expert and a vocational expert).

## IV.    CONCLUSION

For the reasons set forth above, Lavarier's motion for summary judgment [20] is granted in part, and the Commissioner's cross-motion for summary judgment [24] is denied.  The case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

Dated: May 27, 2011